

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

FILED

SEP - 6 2013

CLERK, US DISTRICT COURT
NORFOLK, VA

**WENDY PORCH,**

       **Plaintiff,**

       v.                            **CIVIL ACTION NO. 2:12cv690**

**AMERICAN K-9 INTERDICTION, LLC,** *et al.,*

       **Defendants.**

## *MEMORANDUM OPINION AND ORDER*

Before the Court are two Motions to Dismiss pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure filed by Defendants American K-9 Interdiction, LLC ("AK9I") and John Kello ("Kello"). For the reasons discussed herein, AK9I's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART** and Kello's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTUAL AND PROCEDURAL HISTORY

On December 18, 2012, Wendy Porch ("Plaintiff") filed the instant Complaint alleging violations of Title VII on the grounds that her former employer AK9I discriminated against her because of her sex, retaliated against her for complaining about harassment inflicted upon her by her former supervisor Kello and other coworkers, and created a hostile work environment. She also claims retaliation under the False Claims Act, failure to pay overtime wages in violation of the Fair Labor Standards Act, and various violations of state tort law.

1

Richard McDonald ("McDonald"), a manager at AK9I, hired Plaintiff to work as a dog trainer at AK9I's South Carolina office. Compl. ¶ 8. She was employed by AK91 from November 29, 2010 to July 7, 2011. Compl. ¶¶ 8, 57. Plaintiff trained dogs to detect explosive devices. Compl. ¶ 10. The dogs were later sent to Afghanistan and other countries to work with U.S. military forces. *Id.* Plaintiff says she was told early in her employment by various AK9I supervisors that female employees had never been and would not be sent to Afghanistan to work with dogs. Compl. ¶ 11. Employees in such positions received increased pay and a security clearance. *Id.* Plaintiff lived in company housing during her employment. Compl. ¶ 14. AK9I paid Plaintiff a salary of $55,000 per year and told her that she was exempt from overtime pay. Compl. ¶ 15. Plaintiff contends that she frequently worked more than 40 hours per week. Compl. ¶ 16.

Plaintiff alleges that she was sexually harassed by McDonald. During January 2011, McDonald teased Plaintiff about sleeping with two coworkers. Compl. ¶ 17. The next month, McDonald said to Plaintiff, "Isn't that right, Wendy? Aren't women only good for one thing? You are only good for lying on your back with your legs in the air." Compl. ¶ 21. On January 28, 2011, Plaintiff was assigned to a training team that Defendant Kello supervised. Compl. ¶ 18. Kello told her that she had been placed on his team because a coworker had demanded that his wife not be on the team because of Kello's reputation as a womanizer. Compl. ¶ 19. Immediately thereafter, Kello started flirting with Plaintiff and making comments about "how good her body looked." Compl. ¶ 20. On February 21, 2011, Kello grabbed Plaintiff's thigh during a work break and had another trainer, Daniel Barnett, do the same. Compl. ¶ 22. She told them to stop and respect her space, *id.*, and reported the incident to McDonald. Compl. ¶ 23. In

response, he told her that AK9I would lose their government contract if the Marine Corps found out about Kello and Barnett's behavior. *Id.*

Later that month, after a going-away party for a coworker, Plaintiff contends that Kello attempted to seduce Plaintiff at her company housing. Compl. ¶ 24. She refused his advances three times. *Id.* Kello then told Plaintiff that Rhett Riddle ("Riddle"), another AK9I manager, was his friend and decided which employees would go to a large Marine Corps base that provides training required to qualify to work in Afghanistan. *Id.* Kello told her not to "piss him off" because that would ultimately anger Riddle. *Id.* If she did, Kello said, Riddle would go to McDonald and McDonald would then fire Plaintiff. *Id.* Plaintiff alleges that solely because of these threats, she had sexual intercourse with Kello. *Id.* Several days later, McDonald told Plaintiff that he had lost a bet as to whether she and Kello would sleep together. Compl. ¶ 25. On or around March 4, 2011, while driving to a dinner with coworkers, Kello pulled the car over and tried to climb on top of Plaintiff. *Id.* She pushed him off and told him to stop. *Id.* A week later, Kello propositioned Plaintiff to have an affair with him while training dogs during a future trip to California, and Plaintiff refused. Compl. ¶ 27.

On March 19, 2011, Plaintiff left for Yuma, Arizona for an AK9I trip to train dogs. Compl. ¶ 28. Prior to leaving, and again during the trip, Kello told Plaintiff that McDonald had warned Kello not to sleep with her. Compl. ¶¶ 29, 33. While traveling to Yuma, Plaintiff and her coworkers traveled in an AK9I vehicle. Compl. ¶ 30. During the trip, which lasted from March 19 through early May, Plaintiff often worked more than 10 hours per day in addition to travel time. Compl. ¶ 31. On several occasions, coworkers left Plaintiff for the entire day while they worked at a customer site. Compl. ¶ 32.

On March 22, 2011, while coworkers were in Yuma for training, Kello came into Plaintiff's hotel room and fondled her from behind; she told him to stop. Compl. ¶ 34. Early the next month, Plaintiff called Rosario Tuminelli ("Tuminelli"), her indirect supervisor, and told him that Kello had verbally abused her in front of Marine trainees and called her a "f**king c*nt." Compl. ¶ 35. Tuminelli told her, "If you were having this conversation with Nigel Rhodes [AK9I's owner] or Mike Dougherty [an executive at the AK9I office in Virginia], [Kello] would be brought home immediately and fired." Id. A few days later, Kello told Plaintiff that she should not have complained to Tuminelli. Compl. ¶ 36.

In late April, Kello sent Plaintiff a text message saying, "Well if you're ready, how do you want it then? . . . C**k sandwich is today's special." Compl. ¶ 38. On May 2, 2011, Kello sent Plaintiff a text message saying, "I'm gonna bring your food you want me to eat that p***y." Compl. ¶ 40. He also sent her a text message saying, "We should f**k like rabbits to celebrate [the death of Osama bin Laden]" and a multimedia text message with a picture of his crotch and the words, "I'm waiting." Compl. ¶ 42. On the same day, while Plaintiff was sitting in the vehicle, Kello came to the door and grabbed Plaintiff's buttocks and crotch. Compl. ¶ 41. She told him to leave her alone and hit him. Id. Also that day, while stopped at a gas station, Kello approached her from behind and pressed his groin against her backside; she told him to stop. Id.

During the Yuma trip, because of her frustration with her working conditions, Plaintiff applied for a job with K2 Solutions, another company that trains bomb-detection dogs. Compl. ¶ 37. K2 Solutions offered her employment. Id. After she returned, on May 13, 2011, Plaintiff asked McDonald if he wanted her to leave the company. Compl. ¶ 43. He told her that he did not, and that she was an excellent employee who did "what was asked of her and then some." Id. During the same conversation, Plaintiff told McDonald that, during a trip to California to train

4

dogs, Kello failed to properly feed, water, and air the dogs. Compl. ¶ 44. She also advised him that Kello picked the dogs up by their heads and shook them and threw one dog against its crate for misbehaving. *Id.* McDonald told her that he had done some of the same things himself, but was upset about Kello improperly watering the dogs. *Id.* Plaintiff told McDonald about Kello's verbal abuse. Compl. ¶ 45. McDonald told her that such behavior was normal for Kello. *Id.* Plaintiff also told McDonald that she had been harassed and bullied by Chad Radt, a coworker, and that she intended to file harassment charges against him. Compl. ¶ 46. Plaintiff believed that McDonald intended to support her, so she declined the job offer from K2 Solutions. Compl. ¶ 47.

Several days later, Plaintiff says McDonald teased Plaintiff about shaving her legs and asked a coworker "how she would like to get in bed with those [Plaintiff's] legs." Compl. ¶ 48. The next month, McDonald told Plaintiff that "what goes on here in South Carolina stays here in South Carolina." Compl. ¶ 49. Plaintiff understood that comment to mean that she should not go to Human Resources at AK9I's Virginia headquarters to complain about Kello or anything else. *Id.*

On June 21, 2011, Debbie Rowley, an employee in A9KI's Human Resources department, met with Plaintiff and Riddle and informed Plaintiff that Renato Denaro, a federal agent at the Yuma site, had complained about her. Compl. ¶ 50. Denaro later denied making the complaint. *Id.* Rowley also accused Plaintiff of trying to break up two coworkers who were in a relationship and urinating in front of Marines while training them in South Carolina. Plaintiff says that both allegations are false. *Id.*

On June 26, 2011, Plaintiff became sick and left McDonald a voicemail indicating that she would not be at work the next day. Compl. ¶ 51. Two days later, Plaintiff left McDonald a

message advising him that her doctor had taken her off work indefinitely for her illness. Compl. ¶ 52. That same day, George Harper, Plaintiff's attorney, faxed a letter to AK9I's Virginia headquarters describing the harassment and retaliation Plaintiff had experienced and her resulting illness. Compl. ¶ 53. On June 29, 2011, Riddle came to Plaintiff's house and handed her a letter stating that she must move out of the company housing by July 3, 2011. Compl. ¶ 54.

On June 30, 2011, McDonald allegedly told AK9I's owner, Nigel Rhodes, that he would "get rid of" Plaintiff. Compl. ¶ 55. The next day, Plaintiff received a letter from Rowley stating that her doctor's note was insufficient because it was signed by a nurse, not a doctor, and Plaintiff would be fired if she did not report to work on July 5, 2011. Compl. ¶ 56. On July 7, 2011, Plaintiff received a letter from Rowley stating that she had been fired for not calling in properly to report her absence. Compl. ¶ 57. A few weeks before Plaintiff's termination, McDonald had told another employee that Plaintiff would not be with the company for long. Compl. ¶ 58. AK9I later lost its government contract and closed its South Carolina office. Compl. ¶ 59.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 7, 2011. Compl. ¶ 60. On September 20, 2012, the EEOC issued Plaintiff a Right-to-Sue letter. Compl. ¶ 61. Plaintiff seeks $2,000,000 each in compensatory and punitive damages, attorney's fees and costs, and interest.

On January 29, 2013, and February 11, 2013, respectively, AK9I and Kello filed motions to dismiss eight of the ten counts raised in the complaint for lack of subject-matter jurisdiction and failure to state a claim. Plaintiff filed an opposition to AK9I's motion on February 11, 2013 and to Kello's on February 25, 2013. On February 19, 2013, and March 4, 2013, respectively,

AK9I and Kello filed replies to Plaintiff's opposition motions.  Accordingly, this matter is now ripe for disposition.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") governs the dismissal of an action where the Court lacks subject matter jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).  Defendants may challenge subject matter jurisdiction using one of two methods. First, a defendant may contend that the complaint is facially insufficient because it "fails to allege facts upon which subject matter jurisdiction can be based." *Kerns v. United States,* 585 F.3d 187, 192 (4th Cir.2009) (quoting *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)).  In this situation, "the facts alleged in the complaint are taken as true." *Id.*  Second, a defendant may seek dismissal by contending "that the jurisdictional allegations of the complaint [are] not true." *Id.*  In this second type of challenge, the pleadings are regarded as mere evidence, and the Court may consider evidence outside the pleadings to evaluate jurisdiction. *Id. See also Arbaugh*, 546 U.S. at 514.  When a defendant challenges subject matter jurisdiction by raising a factual dispute, the plaintiff bears the burden of proving the truth of the facts by a preponderance of the evidence. *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citations omitted).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim upon which relief can be granted tests the sufficiency of a complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).  When reviewing a Rule 12(b)(6) motion, the district court assumes all facts alleged in the complaint to be true, *id.*, and should grant the motion if the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The

plausibility standard requires a plaintiff to demonstrate more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

Plaintiff presents ten different counts in her Complaint based on various allegations of sex-based discrimination and harassment she endured at the hands of Defendants AK9I and Kello:

(1) *Quid pro quo* sex discrimination in violation of Title VII, 42 U.S.C. § 2000e-2;

(2) Sex discrimination for failure to promote in violation of Title VII, 42 U.S.C. § 2000e-2;

(3) Hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2;

(4) Retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a);

(5) Retaliation in violation of the False Claims Act, 31 U.S.C. §3730(h)(1);

(6) Sexual battery in violation of state law;

(7) Intentional infliction of emotional distress in violation of state law;

(8) Negligent retention in violation of state law;

(9) Negligent supervision in violation of state law; and

(10) Unpaid overtime in violation of the Fair Labor Standards Act, 29 U.S.C. § 216(b).

Porch brings each of these claims against AK9I and Counts 6 and 7 against Kello as well. AK9I moves to dismiss Counts 1, 3, and 4 for lack of subject matter jurisdiction and Counts 5 through 9 for failure to state a claim upon which relief can be granted.   Kello moves to dismiss Counts 6 and 7.

## A. AK9I'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Defendant AK9I contends that a Rule 12(b)(1) dismissal is appropriate because Plaintiff has not exhausted her administrative remedies for her Title VII claims of *quid pro quo* sex discrimination, retaliation, and a hostile work environment.  If AK9I's claim is true, Plaintiff's failure to exhaust would deprive the Court of subject matter jurisdiction.  *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).  AK9I argues that Plaintiff failed to exhaust her administrative remedies because: (1) Plaintiff's EEOC charge omitted any allegation that Kello coerced her into having sexual intercourse with him, and (2) the supporting facts for her retaliation claim differ between the EEOC charge and her Complaint.  Plaintiff rebuts AK9I's arguments on the grounds that her allegation against Kello and the retaliation claim described in her Complaint are reasonably related to the EEOC charge allegations and would have followed from a reasonable administrative investigation conducted by EEOC.

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to "discriminate against any individual . . . because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), or to discriminate because an individual has opposed an unlawful employment practice, *id.* §2000e-3(a).  Prior to filing suit in court, a Title VII plaintiff "must exhaust h[er] administrative remedies by bringing a charge with the EEOC."  *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000).

A plaintiff's Title VII complaint may not exceed the scope of her EEOC charge.  *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2000).  "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a

subsequent Title VII lawsuit." *Jones*, 551 F.3d at 300 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)). "[A] plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005). Title VII claims that "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof . . . are procedurally barred." *Id.* at 509 (quotation omitted). The exhaustion requirement provides notice to the employer and promotes conciliation and judicial economy. *Id.* at 510.

### i. Count 1 – *Quid Pro Quo* Sex Discrimination

*Quid pro quo* discrimination occurs when a benefit or term of employment is conditioned on submission to a supervisor's sexual advances. *Katz v. Dole*, 709 F.3d 251, 254 (4th Cir. 1983). While Title VII does not itself distinguish between claims of sexual discrimination based on *quid pro quo* discrimination and hostile work environment, the former generally refers to explicit demands for sexual favors in exchange for a job benefit, while the latter requires demeaning behavior so severe that it alters the conditions of employment. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 752 (1998); *see also West v. MCI Worldcom, Inc.*, 205 F. Supp. 2d 531, 543 (E.D. Va. 2002) (outlining the elements of a *quid pro quo* claim). AK9I contends that Plaintiff's allegation that Kello coerced her into sexual intercourse is "the fulcrum" of her *quid pro quo* sexual harassment claim. AK9I Mot. Dismiss 5. But Plaintiff did not list that allegation in her EEOC charge, and AK9I therefore argues that the complaint's *quid pro quo* sexual harassment claim impermissibly exceeds the scope of the EEOC charge. Her EEOC charge instead referenced Kello's groping and lewd text messages.

Plaintiff may not pursue claims in her Title VII lawsuit that were not included in her original EEOC charge. *Syndor v. Fairfax Cnty., Va.*, 681 F.3d 591 (4th Cir. 2012). Therefore, a Title VII plaintiff fails to exhaust when the "administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [the] formal suit." *Chacko*, 429 F.3d at 506. Accordingly, the factual statement is a "crucial element" of the EEOC charge because it facilitates the EEOC's investigatory process and puts the defendant on notice of plaintiff's allegations. *Bolt v. Norfolk Southern Corp.*, 22 F.Supp.2d 512, 517 (E.D. Va. 1997). However, a specific factual claim omitted from the EEOC filing may nonetheless be pursued in a Title VII suit if the omitted claim is "reasonably related" to the allegations and claims in the initial administrative charge or if the omitted claim could reasonably be expected to follow from the administrative investigation. *Smith*, 202 F.3d at 247. The Fourth Circuit has "therefore found exhaustion where both the administrative complaint and formal litigation concerned discrimination in promotions but involved different aspects of the promotional system, and where both the EEOC charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct." *Sydnor*, 681 F.3d at 594 (quotations and citations omitted).

In *Syndor*, the court allowed the plaintiff to proceed with a disability discrimination claim because both the EEOC charge and complaint alleged denial of the same right (reasonable accommodation for a disabled employee) and referenced the same timeframe and parties. It rejected the defendant's argument that the claims were not reasonably related because the plaintiff requested different accommodations. Plaintiff argues that her case is similar to *Syndor* because: (1) her EEOC charge and complaint reference the same place of work and parties and allege the same type of discrimination, and (2) the claims are reasonably related to the EEOC

charges and would have followed from a reasonable administrative investigation conducted by EEOC.  Pl.'s Opp'n to Def. AK9I's Mot. Dismiss 6.

In her EEOC charge, Plaintiff did check the box indicating that she had been subjected to discrimination based on sex.  Under the particulars section, Plaintiff supported her claims with allegations that she had been harassed by Kello and McDonald, called derogatory names, groped and grabbed in her crotch area, and received sexually explicit text messages from Kello.  But nowhere in her EEOC charge did Plaintiff allege or even imply that she submitted to Kello's sexual advances because he expressed that her refusal would negatively affect her employment or advancement opportunities.  Additionally, Plaintiff omitted any mention of sexual intercourse between herself and Kello.  Without such an allegation or implication, AK9I could not have been put on notice of the *quid pro quo* claim raised in her complaint.  *See Bolt*, 22 F.Supp.2d at 517 (denying Plaintiff's *quid pro quo* claim where the EEOC charge failed to mention any pay or promotion issues); *Evans v. Williamsburg Technical Coll.*, No. 4:03-3939, 2007 WL 1068183 *12-*13 (D.S.C. Mar. 29, 2007) (finding that plaintiff failed to exhaust her administrative remedies for a *quid pro quo* claim where her EEOC charge stated that she engaged in consensual sex with her superior but did not allege coercion).

Furthermore, Plaintiff's *quid pro quo* sex discrimination claim is not reasonably related to the claims of retaliatory conduct detailed in her EEOC charge.  In *Bolt*, the plaintiff filed two EEOC charges alleging sexual harassment and retaliation after his co-worker made repeated sexual advances like grabbing plaintiff's buttocks, attempting to hug him, and pulling plaintiff onto his lap and performing simulated homosexual acts. *See Bolt*, 22 F. Supp. 2d. at 513-14. *Id.* Even with those allegations, the court dismissed the *quid pro quo* sexual harassment claim because "[plaintiff] made no promotion or pay allegations in [his EEOC charge] and such

allegations are not reasonably related to [the hostile work environment claims]." *Id.* at 517.

Here, it cannot reasonably be inferred that Kello coerced Plaintiff into having sexual intercourse simply because she was subjected to her co-workers' unwelcomed conduct or because she was terminated after reporting harassment. It is also unlikely the *quid pro quo* allegation would have followed from a reasonable EEOC investigation because Plaintiff did not disclose the alleged coerced intercourse until after she filed her Complaint and did not imply in the charge that she was threatened with an adverse employment action. *See Chacko*, 429 F.3d at 512 ("[A] reasonable investigation of discrete instances of supervisor misconduct not involving name calling could not be expected to lead to a continuous pattern of nonsupervisory misconduct which did involve name calling."). Accordingly, AK9I's motion to dismiss Plaintiff's *quid pro quo* sex discrimination claim is **GRANTED**.

### ii. Count 3 – Hostile Work Environment

AK9I raises a similar argument regarding the hostile work environment claim, arguing that Plaintiff's coerced sexual intercourse allegation is also central to her hostile work environment claim. In addition, AK9I points out that Plaintiff names coworkers Daniel Barnett and Chad Radt as harassers in her complaint but not in the EEOC charge, and argues that this also constitutes failure to exhaust her administrative remedies.

To establish a Title VII claim for hostile work environment, a plaintiff must show that she was subject to (1) unwelcome harassment, which is (2) based on sex, (3) sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment, and (4) imputable to the employer. *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010). Both Plaintiff's EEOC charge and her Complaint state that: (1) she believes she was discriminated against because of her sex; (2) Kello called her a "f**king c*nt,"

groped her, and sent her lewd text messages, and McDonald told her that she was "only good for lying on [her] back with [her] legs in the air;" and (3) she made complaints to management and the Human Resources department but nothing was done to stop the harassment. Although she omitted the coerced intercourse allegation from her EEOC charge, Plaintiff need not allege coerced intercourse to properly maintain a hostile work environment claim. *See Okoli v. City of Baltimore*, 648 F.3d 216, 220-21 (4th Cir. 2011) (finding severe and pervasive harassment where the defendant fondled the plaintiff's leg, forcefully kissed her, and made sex-based jokes, comments about sexual fantasies and the plaintiff's underwear, and various propositions).

Unlike the *quid pro quo* claim just discussed, the hostile work environment claim detailed in the EEOC charge outlines the same elements as that detailed in the complaint, even if the conduct alleged is not precisely identical. And Plaintiff's failure to include the allegations against Barnett and Radt in her EEOC charge does not mean that the charge is not "reasonably related" to the hostile work environment claim in her Complaint. Plaintiff simply mentions Barnett and Radt to support her hostile work environment claim; she does not indicate that they are the main perpetrators of the conduct. Plaintiff has exhausted her administrative remedies for her Title VII hostile work environment claim because she sufficiently alleges the same conduct and type of discrimination and references the same parties in both her EEOC charge and her Complaint. Therefore, AK9I's motion to dismiss Plaintiff's claim of hostile work environment based on sex is **DENIED**.

### iii. Count 4 – Retaliation (Title VII)

Title VII forbids an employer from retaliating against an employee through an adverse employment action "because" the employee engaged in protected conduct. 42 U.S.C. § 2000e-3(a). Protected conduct includes "oppos[ing] any practice made an unlawful employment

practice." *Id.* Plaintiff's complaint alleges that she was terminated in retaliation for her attorney sending AK9I a letter that described harassment she experienced. However, Plaintiff's EEOC charge does not mention her attorney's letter and implies that she was terminated in retaliation for complaining to management and the Human Resources department about the harassment she experienced. AK9I argues that the different retaliation grounds are not reasonably related, therefore Plaintiff failed to exhaust administrative remedies and the Court lacks subject matter jurisdiction.

The Court disagrees and finds that Plaintiff exhausted her administrative remedies for her retaliation claim under Title VII. Plaintiff engaged in protected activity both when she formally complained of harassment to management and the Human Resources department and when her attorney sent a letter to AK9I. Both complaints alerted her supervisors about the same underlying course of harassing conduct. In other words, the basis for Plaintiff's discrimination claims in both her EEOC charge and her Complaint are the same—retaliation for complaining about McDonald and Kello's harassment. Both allegations accuse AK9I of terminating her for engaging in the protected activity of complaining. *See Jones*, 551 F.3d at 304 (finding exhaustion where "the alleged retaliatory termination was merely the predictable culmination of [the] alleged retaliatory conduct"); *Smith*, 202 F.3d at 248 (finding exhaustion where the EEOC charge alleged retaliation based on chastising and threats, and the complaint alleged retaliation based on forcing plaintiff to work in close proximity to the harasser). Therefore, AK9I's motion to dismiss Plaintiff's Title VII retaliation claim is **DENIED**.

## B. AK9I'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### i. Count 5 – Retaliation (False Claims Act)

AK9I alleges that Plaintiff fails to satisfy the "protected activity" element of a *prima facie* case for retaliation under the False Claims Act ("FCA") and thus fails to state a claim. The FCA was "designed to discourage fraud against the federal government." *Mann v. Heckler and Kock Defense, Inc.*, 630 F.3d 338, 3420 (4th Cir. 2010). It imposes civil liability on persons who defraud government programs, for example by "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The FCA permits a private party to bring a *qui tam* action—an action in the name of the United States—against a person who violates its provisions. *Id.* § 3730(b). It also contains a retaliation or "whistleblower" provision, under which Plaintiff brings her FCA claim, which provides relief for "[a]ny employee . . . that . . . is discharged, . . . threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [its] subchapter." *Id.* § 3730(h)(1).

To establish a *prima facie* case for retaliation under the FCA, a plaintiff "must prove that (1) he took acts in furtherance of a *qui tam* suit, (2) his employer knew of these acts, and (3) his employer [took adverse action against] him as a result of these acts." *Mann*, 630 F.3d at 343 (quoting *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997)). AK9I focuses on the first element, which is referred to as the "protected activity" element and "encompasses measures taken 'in furtherance of an action . . . filed or *to be filed*' under the FCA's provision.'" *Id.* (quoting 31 U.S.C. § 3730(h)) (emphasis omitted). An employee does not have to actually file a *qui tam* suit to satisfy the protected activity element. *Id.* (citing

*Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867 (4th Cir. 1999)).  An employee engages in protected activity "when [their] opposition to fraud takes place in a context where 'litigation is a distinct possibility,' [or] 'when the conduct reasonably could lead to a viable FCA action.'"  *Id.* at 344 (quoting *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)).

Plaintiff's complaint simply states that when she complained about the mistreatment of the dogs, which were being trained pursuant to a government contract, she was engaging in protected activity and was fired as a result.  AK9I points out that Plaintiff failed to allege that AK9I committed any act that constitutes fraud against the government under the FCA or explain how her complaint was in furtherance of a *qui tam* action.  In her response to AK9I's motion to dismiss, Plaintiff elaborates that when she complained to McDonald about Kello's mistreatment of the dogs she engaged in protected activity under the FCA because the dogs were being trained to work on government contracts, and that her complaint was a part of an investigation into a possible FCA claim.  Plaintiff simply states in her Memorandum in Opposition that she *believes* the government contracts held by AK9I required humane treatment of the trained dogs but is awaiting a response to a Freedom of Information Act ("FOIA") request to confirm that request, and that she witnessed a possible violation of the contracts.  Pl.'s Mem. in Opp'n 12.

In *Mann*, the Fourth Circuit held that in the absence of fraud, a violation of a regulation is not actionable under the FCA.  *Mann*, 630 F.3d at 346 ("But the FCA is not concerned with . . . regulations. . . . 'Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct.'" (quoting *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996))).  Plaintiff's investigation of AK9I's possible government contract violation is irrelevant because Plaintiff does not allege that AK9I actually

committed fraud. Furthermore, simply reporting her concern to McDonald is insufficient to establish that she was acting "in furtherance of" a *qui tam* action. *See Zahodnick v. Int'l Business Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997) (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Plaintiff claims that she was investigating a possible violation of AK9I's contracts with the government, but she does not allege that she was investigating in furtherance of a *qui tam* action. Pl.'s Mem. in Opp'n 12. In her complaint, Plaintiff has simply failed to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. She states that she is prepared to amend her complaint if the FOIA request confirms her expressed belief that there was fraud, but such a confirmation would not cure her failure to establish that she was acting in furtherance of a *qui tam* action at the time she reported the treatment of the dogs to McDonald. Accordingly, AK9I's motion to dismiss her claim is **GRANTED**.

### ii. Preemption of Counts 6 (Sexual Battery), 7 (Intentional Infliction of Emotional Distress), 8 (Negligent Retention), and 9 (Negligent Supervision)

#### a. Choice of Law

District courts have supplemental jurisdiction over state law claims if "they form part of the same case or controversy," 28 U.S.C. § 1367(a), as claims over which the court has original federal jurisdiction. Claims form the same case or controversy when they arise from "a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). Counts 6 through 9 are state law tort claims and Plaintiff's Title VII claims share a "common nucleus of operative fact" because they are based on the same allegations against Kello and McDonald of harassing conduct. Therefore, the Court has supplemental jurisdiction.

AK9I contends--and Plaintiff does not dispute--that South Carolina law governs Plaintiff's Counts 6 through 9 because South Carolina is the "place of the wrong." AK9I Mot. Dismiss 11. A federal court exercising supplemental jurisdiction applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). In a tort action, Virginia (the forum state) "applies the law of the state where the tortious conduct or injury occurred." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (citing *Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993). "The place of the wrong . . . is defined as the place where 'the last event necessary to make an act[or] liable for an alleged tort take place.'" *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (quoting *Miller v. Holiday Inns, Inc.*, 436 F. Supp. 460, 462 (E.D. Va. 1977)). The "last event necessary" in a tort cause of action is the injury. *Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp. 2d 659, 663 n.9 (E.D. Va. 2001). In this case, the bulk of Plaintiff's alleged injuries occurred in or related to acts in South Carolina; South Carolina law therefore governs Plaintiff's state law claims.

### b. Counts 6 and 7 – Sexual Battery and Intentional Infliction of Emotional Distress

AK9I argues that Plaintiff's claims of battery, stemming from Kello's coerced intercourse and groping, and intentional infliction of emotional distress, centering on Kello's batteries and lewd text messages, arose out of and in the course of her employment. Therefore, AK9I contends, they are preempted by the South Carolina Workers' Compensation Act ("the Act") and should be dismissed. The Act permits an employee to recover workers' compensation benefits if she sustains an injury that "aris[es] out of and in the course of employment." S.C. Code Ann. § 42-1-160(A). And the Act "is the exclusive means of settling personal injury claims which come

19

under the Act," so Plaintiff's common law claims are preempted if they fall under the Act. *Loges* v. *Mack Trucks, Inc.*, 417 S.E.2d 538, 540 (S.C. 1992). Plaintiff responds that her injuries did not arise out of or in the course of employment because her injuries occurred outside of work hours and away from her normal workplace.

"'Arising out of' refers to the injury's origin and cause, whereas 'in the course of' refers to the injury's time, place, and circumstances.'" *Osteen* v. *Greenville Cnty Sch. Dist.*, 508 S.E.2d 21, 24 (S.C. 1998). An injury "arises out of" employment when it is proximately caused by the employment or by activities arising from employment. *Id.* An injury occurs "in the course of" employment when it happens "within the period of employment at a place where the employee reasonably may be in the performance of his duties and while fulfilling those duties or engaged in something incidental thereto." *Broughton* v. *S. of the Border*, 520 S.E.2d 634, 639 (S.C. Ct. App. 1999). An employee "need not be in the actual performance of the duties for which he was expressly employed in order for his injury or death to be in the 'course of employment' [as long as] the employee is engaged in a pursuit or undertaking . . . which in some logical manner pertains to . . . his employment." *Beam* v. *State Workmen's Comp. Fund*, 200 S.E.2d 83, 86 (S.C. 1973).

In her complaint, Plaintiff does not dispute that Kello's conduct "arose out of employment" and indeed explicitly states that Kello used his supervisory authority to accomplish the alleged battery and intentional infliction of emotional distress. Compl. ¶¶ 96, 105. In addition, Plaintiff concedes in her complaint that Kello "took these actions within the scope of his employment" and alleges that AK9I is vicariously liable for his conduct. *Id.* Yet, Plaintiff now denies in her Opposition that Kello's conduct was in the "course of her employment" because it occurred outside of work hours and not at her workplace. Pl.'s Mem. in Opp'n 12-13.

20

Plaintiff cannot concede to Kello's conduct falling within the scope of employment to assert

vicarious liability, and then later deny that the same conduct falls within the scope of

employment to prevent preemption of her claims.  Plaintiff's claims are preempted by the Act

because she concedes in her Complaint that they arose out of and in the course of employment.

AK9I's motion to dismiss Counts 6 and 7 as to AK9I is **GRANTED**.

### c. Counts 8 and 9 -- Negligent Retention and Supervision

AK9I argues that because Plaintiff's injuries arose out of and in the course of

employment, her negligent supervision and retention claims also are preempted by the Act.

Plaintiff responds that AK9I's negligent supervision and retention of Kello was the direct and

proximate cause of the alleged batteries which did not arise out of or in the course of

employment.  Negligent supervision and retention claims are preempted by the Act when they

arise out of and in the course of employment. *See Dickert,* 428 S.E.2d at 701.  As discussed

above, Plaintiff concedes in her Complaint that Kello's conduct arose out of and in the course of

employment. Since Plaintiff also concedes that AK9I's negligent supervision and retention of

Kello was a direct and proximate cause of his conduct; it must follow that the claims arise out of

and in the course of employment.  Compl. ¶¶ 111, 116.  Indeed, Plaintiff points specifically to

AK9I's failure to supervise Kello while Plaintiff "was traveling on behalf of AK9I." *Id.* ¶ 116.

Therefore, AK9I's motion to dismiss Counts 8 and 9 is **GRANTED**.

## C. KELLO'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

Plaintiff only brings two of the ten counts against Kello: Count 6 for sexual battery and

Count 7 for intentional infliction of emotional distress.  Kello makes several arguments to

support his motion to dismiss Plaintiff's claims.  First, Kello argues that Plaintiff failed to

exhaust her administrative remedies for the Title VII claims and the Court therefore lacks subject matter jurisdiction over the federal claims and supplemental jurisdiction over both of the state law claims against Kello. Second, Kello argues that even if the Court has jurisdiction, Plaintiff's intentional infliction of emotional distress claim is preempted by her Title VII claims. Lastly, Kello argues that even if Plaintiff can bring an intentional infliction of emotional distress claim, the facts she alleges fail as a matter of law. Kello does not challenge the battery claim other than on jurisdictional grounds. The Court will address each of his arguments in turn.

### i. Subject matter jurisdiction – Counts 6 and 7

Kello largely reiterates the exhaustion arguments made by AK91, asserting that the Court lacks subject matter jurisdiction over Plaintiff's Title VII claims because Plaintiff failed to exhaust her administrative remedies by omitting the coerced intercourse allegation from her EEOC charge. Therefore, he contends, the Court lacks supplemental jurisdiction over the state law claims. But this Court has already rejected this argument as to Plaintiff's hostile work environment claim. *See supra* Part III.A.ii. Kello does not dispute that the battery and intentional infliction of emotional distress claims share the requisite "common nucleus of operative fact," *Gibbs*, 383 U.S. at 725, with the hostile work environment claim. The Court finds that both are based on Kello's alleged harassment of and discrimination against Plaintiff. This Court therefore has jurisdiction over Counts 6 and 7 as raised against Kello, and his motion to dismiss Count 6 (sexual battery) is **DENIED**.

### ii. Failure to State a Claim – Count 7

Kello argues that Plaintiff's Title VII claims and her state law battery claim "preempt" her intentional infliction of emotional distress claim because all are based on largely the same allegations: Kello coerced Plaintiff to have sexual intercourse with him, groped Plaintiff's crotch,

and sent Plaintiff lewd text messages.  Kello argues that since Plaintiff already has a remedy in state and federal law, she cannot seek an additional remedy for the same conduct through her intentional infliction of emotional distress claim.

In private sector employment discrimination cases, the plaintiff "clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459 (1975).  And under South Carolina law, a Title VII claim does not necessarily preempt a common law claim for intentional infliction of emotional distress.  *See Frazier v. Badger*, 603 S.E.2d 587, 592 (S.C. 2004) ("We recognize that [Plaintiff] had a statutory right to file a civil rights complaint . . . for sexual harassment.  However, because this is a right created by statute and not the common law of torts, we find no reason to restrict [Plaintiff's] right to sue . . . .").  "[W]here an anti-discrimination statute provides an exclusive remedy for a plaintiff's claim of discriminatory conduct, the plaintiff may still proceed with state law claims that "are raised in order to vindicate personal injuries that extend beyond discrimination in the workplace." *Schoolcraft v. Wabtec Passenger Transit*, 2011 WL 5909943, at *2 (D.S.C. 2011) (*citing Otto v. Heckler*, 802 F.2d 337 (9th Cir. 1986)).  *See also Charlot* v. *Donley*, No. 3:11-579, 2012 WL 3264568, at *5 (D.S.C. Aug. 9, 2012).  *But see Doe v. Erskine Coll.*, No. 8:04-23001, 2006 WL 1473853, at *14 (D.S.C. May 25, 2006).  The Court finds that Plaintiff's intentional infliction of emotional distress claim is therefore not preempted by her federal claims.

Kello argues that even if Plaintiff's intentional infliction of emotional distress claim is not preempted by her Title VII claims, it is "preempted" by her state law sexual battery claim.  *See also Todd v. S.C. Farm Bureau Mut. Ins.*, 321 S.E.2d 602, 613 (S.C. Ct. App. 1984) ("[Intentional infliction of emotional distress] was designed not as a replacement for the existing

tort actions [but] as a remedy for tortious conduct where no remedy previously existed.");

*Frazier*, 603 S.E.2d, at 592 (implying *Todd* is correct as to common law torts). *See also*

*DeCecco v. University of S.C.*, 918 F. Supp. 2d 471, 520 n. 53 (D.S.C. 2013); *Levine v.*

*Walterboro City Police Dept.*, No. 2:05-2906-18, 2006 WL 2228993, at *2 (D.S.C. Aug. 3,

2006). Plaintiff's sexual battery claim is based on her allegations that Kello coerced her to have

intercourse with him by threatening her termination and groped her. Compl. ¶ 94. Plaintiff's

intentional infliction of emotional distress claim is based on the same allegations as her sexual

battery claim, plus her contention that Kello sent her lewd text messages. Compl. ¶ 98. Since

Plaintiff may seek a remedy for the alleged coerced intercourse and groping through her sexual

battery claim, her intentional infliction of emotional distress claim is barred to the extent it seeks

an additional remedy for the same conduct.

    Under South Carolina law, to establish the tort of intentional infliction of emotional

distress or outrage, the plaintiff must establish the following:

> (1) the defendant intentionally or recklessly inflicted severe
> emotional distress, or was certain, or substantially certain, that
> such distress would result from his conduct; (2) the conduct was so
> extreme and outrageous so as to exceed all possible bounds of
> decency and must be regarded as atrocious, and utterly intolerable
> in a civilized community; (3) the actions of the defendant caused
> plaintiff's emotional distress; and (4) the emotional distress
> suffered by the plaintiff was severe such that no reasonable person
> could be expected to endure it.

*Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 70 (S.C. 2007) (quotation omitted). South

Carolina courts require a heightened burden of proof for the second and fourth elements of

intentional infliction of emotional distress. *Id.* at 71. The plaintiff must show both that the

conduct on the part of the defendant was extreme and outrageous, and that the conduct caused

distress of an "extreme or severe nature." *Id.* Kello focuses his arguments on the second and fourth elements.

Plaintiff alleges that Kello sent her the following text messages:

(a) "Well if you're ready, how do you want it then? . . . C***k sandwich is today's special."
(b) On the same day that Kello allegedly groped Plaintiff several times:
  -"I'm gonna bring your food you want me to eat that p***y."
  -"I'm waiting" with a multimedia picture of Kello's crotch.
  -"We should f**k like rabbits to celebrate [the death of Osama bin Laden]."

Kello acknowledges that South Carolina law is silent as to whether text messages can be so extreme and outrageous as to satisfy the second element of a claim of intentional infliction of emotional distress. He says that the messages were only lewd, but not threatening. But in the context of the overall course of conduct—for example, three text messages on the same day that Kello, Plaintiff's supervisor, allegedly groped and grabbed Plaintiff more than once—they could be considered more than simply lewd and proposing a consensual sexual encounter. *See Ford v. Hutson*, 276 S.E.2d 776 (S.C. 1981) (considering the context of a business relationship in determining whether conduct is outrageous). And South Carolina courts have allowed claims to proceed where the relevant conduct is neither a prolonged encounter nor explicitly physically threatening. *See Bell v. Dixie Furniture Co.*, 329 S.E.2d 431, 433 (S.C. 1985) (viable claim where defendant told plaintiff he would call a judge and obtain a summons when plaintiff refused to pay $25). Additional facts could change the Court's conclusion—for example, if it were found that plaintiff and defendant's relationship at the time was entirely consensual—but at this juncture, the Court cannot conclude as a matter of law that Kello's conduct fails to satisfy the second element.

As to the fourth element, however, where there is no physical harm alleged, courts should "look initially for more in the way of extreme outrage as an assurance that the mental disturbance

claimed is not fictitious." *Hansson*, 650 S.E.2d, at 71 (quotation omitted).  But Plaintiff only

conclusorily states in her Complaint that she "suffered emotional distress so severe that no

reasonable person could be expected to endure it."  Compl. ¶ 103.  The only additional

information provided in her Complaint is that her attorney stated that Plaintiff "was ill from her

mistreatment at AK9I and being seen by a doctor for it."  *Id.* ¶ 53.  These allegations merely

make it possible, not plausible, that Plaintiff in fact suffered severe emotional distress, and the

Court cannot reasonably infer from the pleadings that Kello is liable for the intentional infliction

of emotional distress.  *Hansson*, 650 S.E.2d, at 72.  Therefore, Kello's motion to dismiss Count 7

is **GRANTED**.  However, the Court will also **GRANT** Plaintiff leave to amend Count 7 of her

complaint.


## IV. CONCLUSION

For the reasons stated above, AK9I's motion to dismiss Counts 1 and 5 through 9 is

**GRANTED**, and AK9I's motion to dismiss Counts 3 and 4 is **DENIED**.  Kello's motion to

dismiss Count 7 is **GRANTED**, and Kello's motion to dismiss Count 6 is **DENIED**.  But,

Plaintiff is **GRANTED** leave to amend her complaint on her claim of intentional infliction of

emotional distress (Count 7) within fifteen (15) days of the date of this Order.

The Court **DIRECTS** the Clerk to send a copy of this Order to the parties.

IT IS SO **ORDERED**.


Raymond A. Jackson
United States District Judge

Norfolk, Virginia
September 5 , 2013